UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
RICKY RIVERA,

                  Plaintiff,                  **<u>MEMORANDUM AND ORDER</u>**
                                                     15-CV-271 (RRM)

              -against-

COMMISSIONER OF SOCIAL SECUIRTY,

                  Defendant.
--------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

       Plaintiff Ricky Rivera brings this action against defendant Carolyn Colvin, Acting

Commissioner of the Social Security Administration (the "Commissioner"), pursuant to 42

U.S.C. §§ 405(g), 1383(c)(3) seeking review of defendant's determination that Rivera is not

entitled to Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security

Act. Rivera maintains that the Commissioner's determination is not supported by substantial

evidence and is contrary to law. Both Rivera and the Commissioner have cross-moved for

judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Def.'s Mem.

(Doc. No. 18); Pl.'s Mem. (Doc. No. 15-1).) For the reasons set forth below, Rivera's motion is

denied and the Commissioner's motion is granted.

## BACKGROUND

## I.    Procedural History

       Rivera filed an application for SSI, with a protective filing date of September 28, 2011,

alleging disability beginning April 28, 2007, due to chronic left hip pain, depression, insomnia,

and bipolar, anxiety, and panic disorders. (Admin. R. at 173–78, 250, 255.) The application was

denied. (*Id.* at 76, 83–86.) Rivera then requested a hearing. (*Id.* at 87–89.) Rivera appeared

before Administrative Law Judge ("ALJ") Margaret A. Donaghy on January 31, 2013. (*Id.* at

24.)  Though, Rivera informed the ALJ that he had counsel, his counsel was not present at the

hearing, and the ALJ adjourned the hearing to allow Rivera to appear with representation and to

permit further development of the record.  (*Id.* at 24–29, 42.)  The ALJ held a hearing on April

11, 2013, at which Rivera appeared and testified, represented by counsel.  (*Id.* at 40–75.)  By

decision dated May 7, 2013, ALJ Donaghy found that Rivera was not disabled.  (*Id.* at 10–23.)

The ALJ's decision became the final decision of the Commissioner when the Appeals Counsel

denied Rivera's request for review on December 17, 2014.  (*Id.* at 1–3.)  This action followed.

## II.    Administrative Record

### a.    Non-Medical Evidence

Born in 1970, Rivera was age 42 at the time of the ALJ's May 2013 decision.  (*Id.* at 43,

173.)  He completed school through the ninth grade, and could speak, understand, and read

English.  (*Id.* at 254, 256.)  He had past work experience as a maintenance worker and

dishwasher at the Culinary Institute and as an ambulance attendant.  (*Id.* at 48–50, 256, 262.)

In a function report dated November 5, 2011, filed in connection with his claim, Rivera

wrote that chronic left hip pain, anxiety, panic attacks, and bipolar disorder limited his activities.

(*Id.* at 233.)  He indicated that he lived in an apartment with his family, including his mother and

younger brother, who had "mental problems."  (*Id.* at 233–34.)  On a typical day, he would wake

up, shower, try to dress himself "in pain," go from his home in Brooklyn to "the City" with his

brother to attend appointments, and then try to sleep "in peace."  (*Id.* at 234.)  He claimed to

have problems sleeping due to hip pain.  (*Id.*)

Rivera could care for his personal needs with some difficulty.  (*Id.* at 234–35.)  His

mother prepared most of his meals, as he often burned his food.  (*Id.* at 235.)  The only

household cleaning he performed was wiping dirt off the kitchen table or counter; otherwise, his

mother and brother did most of the cleaning. (*Id.* at 236.) Rivera attempted to venture outside five days a week, using public transportation, sometimes unaccompanied. (*Id.* 236, 240.) He did not shop because he had no money. (*Id.* at 237.) His condition affected his ability to lift, stand, walk, climb stairs, kneel, and squat. (*Id.* at 238–399.) He could reach, use his hands, and sit (needing to stoop down on the seat slowly and gently). (*Id.* at 239.) He complained of pain for years in his leg, back, and head caused by bending, lifting, and sometimes walking, for which he took medication. (*Id.* at 243, 246–47.) He indicated that the medication knocked him out, at which point he feels no pain. (*Id.* at 247.) He also alleged side effects of seizures and blackouts from medication. (*Id.* at 246.)

Rivera indicated that he could pay bills and count change, but had no money to do so. (*Id.* at 237.) He watched television occasionally and enjoyed drawing. (*Id.*) He went for walks in a nearby park with his younger brother, and attended church every Sunday with his family. (*Id.* at 238.) His panic attacks were triggered mostly by bad news, arguments, or the onset of a feeling that someone was trying to kill him. (*Id.* at 240.) He could not answer how often the attacks occurred, and they lasted for different lengths of time, depending on the situation. (*Id.*) Rivera claimed his anxiety made him more anti-social. (*Id.* at 241.) He used a cane and a brace/splint all the time for walking; he could walk for up to one block before needing to rest for twenty minutes. (*Id.* at 242, 246.) He claimed to have problems paying attention, finishing what he started, and following written instructions; he could sometimes follow spoken instructions. (*Id.* at 242.) He had problems getting along with people in authority, resulting in job loss. (*Id.* at 243.) He also claimed to have problems with memory. (*Id.*)

In his disability report filed in connection with his appeal, Rivera indicated that his condition did not affect his ability to care for his personal needs. (*Id.* at 230.)

Rivera testified at the April 2013 hearing that he had lived with his mother in an apartment since 1983. (*Id.* at 45.) He claimed that he was disabled and unable to work due to constant hip pain after being hit with a baseball bat fifteen or sixteen years earlier. (*Id.* at 51.) This pain also required him to use a cane. (*Id.*) He complained of worsening eyesight requiring "thicker" glasses, which he was supposed to wear all the time, but did not because he needed a new pair. (*Id.* at 51–52.) When he did wear them, his vision was "perfect." (*Id.* at 52.) Rivera further alleged that right leg numbness prevented him from working. (*Id.* at 53.) He had participated in a methadone program since 2009, stating that he last used illegal substances more than three years earlier, when he was incarcerated; he did not consume alcohol. (*Id.* at 47–48, 55–58.) Rivera estimated he could stand for less than one-half hour, sit for about twenty minutes, and lift around ten pounds. (*Id.* at 62.) He did not wash clothes because he did not know how to separate colors, and he did not prepare meals, claiming he burned food. (*Id.* at 63.) Still, he believed he could prepare food if he was on his own. (*Id.* at 63–64.) He could wash a dish or cup, but not perform other household chores such as sweeping. (*Id.* at 64.) Though Rivera stated in his November 5, 2011 function report that he sometimes traveled on public transportation on his own, at the hearing he testified that he always needed someone to accompany him on public transportation because of his anxiety. (*Id.* at 64–65, 240.)

Rivera also testified that he and his brother attended a methadone program five days a week in Manhattan. (*Id.* at 66–67.) Rivera would rise around 10:30 am, get ready along with his brother, and take a taxi to the program, arriving between noon and 1:00 pm. (*Id.* at 66, 68–69.) The program would take a few minutes, and afterwards, he and his brother would go to the convenience store next door to the program, buy "some cakes," and watch animated movies for one and one half to two hours. (*Id.* at 68–69.) They returned home around 3:00 or 3:30 pm. (*Id.*

at 69.)  Rivera would then take his medication, draw or read the Bible, and go to bed around 10:30 pm, although sometimes he could not sleep.  (*Id.* at 70.)

**b.      Medical Evidence Prior to Rivera's September 28, 2011 SSI Application**

**i.      Dr. Rodolfo Sandin, M.D., Treating Physician (May 2001 – July 2007)**

Rodolfo Sandin, M.D., Rivera's psychiatrist, completed a medical examination report on May 1, 2001, at the request of the State agency.  (*Id.* at 837–38.)  Rivera had been referred for treatment beginning March 1996 for alleged seizures which Dr. Sandin found could be related to Xanax withdrawal, though he was unsure.  (*Id.* at 837; *see id.* at 832–52, 855–69, 872–87 (treatment notes).)  Rivera previously abused heroin, and was now participating in a methadone program after having participated in a detoxification program.  (*Id.* at 837.)  Dr. Sandin described Rivera as friendly and cooperative.  (*Id.* at 838.)  Rivera told the psychiatrist that he had obtained a general equivalency diploma ("GED").  (*Id.*)  Upon mental status examination, Dr. Sandin observed Rivera to be "tidy and clean," with coherent and productive, but monotonous, speech.  (*Id.*)  His affect was appropriate, and his mood was anxious and depressed.  (*Id.*)  His general knowledge, insight, and judgment were fair, although he was unable to perform calculations.  (*Id.*)  Dr. Sandin's "impression" was "Panic disorder, depressed.  Rule out panic disorder."  (*Id.*)  The psychiatrist advised against taking Xanax, although Rivera insisted he needed the medication "to survive."  (*Id.*)

On August 10, 2004, Dr. Sandin noted that he continued to see Rivera on a monthly basis for complaints that he "cannot survive."  (*Id.* at 853.)  On mental status examination, Dr. Sandin observed that Rivera was "usually friendly and cooperative."  (*Id.*)  Rivera continued to be tidy and clean, and his speech was coherent, but rambling.  (*Id.* at 854.)  His affect was appropriate and his mood was anxious with no suicidal or homicidal ideation.  (*Id.*)  He denied hearing

voices.  (*Id.*)  Dr. Sandin described Rivera as very needy and passive, totally helpless and hopeless, with tangential thinking/conversations, and no plans for the future.  (*Id.*)  Dr. Sandin noted that Rivera held some odd jobs in the past, but that he felt pressured by people and could not take even minimal stress.  (*Id.* at 853.)  Rivera was continued on Xanax and Ambien.  (*Id.* at 854.)

In an undated medical source statement,[1] Dr. Sandin indicated that Rivera had marked limitations regarding his ability to understand, remember, and carry out detailed instructions; interact appropriately with supervisors and coworkers; and respond appropriately to work pressures and change in a routine work setting.  (*Id.* at 870–71.)  He also found that Rivera had moderate limitations with understanding, remembering, and carrying out short, simple instructions and interacting appropriately with the public.  (*Id.*)  Dr. Sandin based his assessment on the facts that Rivera had a mood disorder, an inability to concentrate, and a history of multiple low-wage jobs that he could not sustain for more than one month.  (*Id.*)

In a July 12, 2007 letter intended to assist Rivera with locating housing, Dr. Sandin indicated that he had provided Rivera with psychotherapy and prescribed medication on a monthly basis based on a diagnoses of "panic disorder depressed."  (*Id.* at 614.)  One of Rivera's symptoms was a fear of "small places," resulting in a shortness of breath.  (*Id.*)  On mental status examination, Dr. Sandin again observed that Rivera was "tidy and clean," with good hygiene. (*Id.*)  He described Rivera as friendly with "manipulative" behavior, an obsequious affect, and an appropriate (anxious) mood.  (*Id.*)  His sensorium was alert, and there was no evidence of a formal thought disorder.  Dr. Sandin stated that Rivera would benefit from "larger proper housing."  (*Id.*)

---

[1] The Commissioner notes that the form used by Dr. Sandin, "HA-1152-U3 (11/2002)," was updated by the agency in June 2006, with a September 2006 effective date, suggesting that the source statement was completed in or before September 2006.  (Def.'s Mem. at 7 n.3.)

### ii. Beth Israel Medical Center (January – August 2009)

Rivera presented at the Beth Israel Medical Center outpatient clinic ("Beth Israel") on January 15, 2009, seeking a physical examination, a prescription for Suboxone, and help ceasing smoking. (*Id.* at 621.) He complained of left hip pain from an injury twenty years earlier. (*Id.*) The attending physician noted that Rivera was an active heroin user who did not want to participate in a methadone program again. (*Id.*) Current medications included Klonopin, Elavil, and Risperdal. (*Id.*) A physical examination yielded unremarkable findings, including normal strength and sensation. (*Id.*) Rivera was referred for chemical dependency treatment. (*Id.* at 621–22.) He subsequently failed to attend a February 19, 2009 follow-up visit. (*Id.* at 663–64.)

Rivera presented at Beth Israel on July 16, 2009, complaining of sweating and looking "yellow"; he was concerned that he had tuberculosis. (*Id.* at 660–62.) He had started a methadone program, but used heroin two days earlier. (*Id.* at 660.) A physical examination produced unremarkable findings, including no evidence of jaundice. (*Id.* at 661.) He was referred for a tuberculin test, (*id.* at 662), and returned on August 26 for a repeat test, (*id.* at 619, 657–59). The record indicates that the tests were negative. (*Id.* at 358.)

### iii. Rikers Island Correctional Facility (March – May 2011)

Medical records generated during Rivera's time incarcerated at Rikers Island Correctional Facility – from March through May of 2011, (*id.* at 271) – indicate that he was overweight and suffered from opioid (heroin) dependence, alcohol abuse, cannabis abuse, anxiety, schizoaffective disorder, and headaches. (*See, e.g.*, *id.* at 274, 465–68.) Rivera's reported symptoms included auditory hallucinations, depression, sleep disturbance, appetite change, and anxiety. (*Id.* at 331.) A physical examination on March 24 revealed that Rivera had a history of seizures since 1994 due to drug withdrawal. (*Id.* at 335.) During a urine drug screen

he tested positive for methadone and benzodiazepines.  (*Id.* at 336.)  Clinical findings were unremarkable, including a normal gait, no muscle atrophy, normal strength, bilaterally equal reflexes, and no upper or lower extremity joint abnormalities.  (*Id.* at 336–37.)  Rivera was oriented to person, place, and time.  (*Id.* at 337.)  He denied hallucinations, delusions, and suicidal and homicidal ideation.  (*Id.*)  Rivera had normal cognition, coherent speech, normal psychomotor activity, logical thought processes, with an anxious, depressed, and irritable mood.  (*Id.*)

Rivera underwent a psychiatric evaluation on March 25, 2011.  (*Id.* at 331–34.)  He complained of bipolar disorder, as well as symptoms of depression, anxiety, panic disorder, and sleep disruption.  (*Id.* at 331.)  He denied any manic symptoms, delusional thinking, or hallucinations, although he indicated that he sometimes heard whispers at night.  (*Id.*)  His medications at the time of the evaluation were Depakote, Risperdal, and Klonopin.  (*Id.*)  He admitted to using cocaine/crack and cannabis, as well as taking benzodiazepines as prescribed.  (*Id.* at 332.)  He also took methadone as part of a rehabilitation program at Lafayette Medical Management, and had last used heroin two to five weeks earlier.  (*Id.* at 332; *see also id.* at 613, 921 (methadone program since May 2009).)  A mental status examination yielded largely unremarkable results, including the following: no memory problems or perceptual distortions; normal thought content; adequate attention, concentration, and impulse control; average intelligence (no gross mental retardation); spontaneous, organized, relevant, and goal-directed thought processes; and no suicidal or homicidal thoughts.  (*Id.* at 333.)  Pressured speech and an anxious and depressed mood were noted, as well as mildly impaired judgment.  (*Id.*)

Rivera received biweekly mental health therapy and monthly psychiatric visits while incarcerated, and continued methadone treatment.  (*Id.* at 292, 297, 317.)  Mental status

examinations repeatedly showed that Rivera was cooperative with good eye contact, of average intelligence, had a euthymic mood, appropriate affect, adequate impulse control, organized and/or relevant thought processes, adequate or only mildly impaired judgment, and no thoughts of suicide or homicide. (*Id.* at 287, 293, 298, 301–02, 314, 318.) Specifically, an April 7 evaluation noted no perceptual distortions. (*Id.* at 318.) On April 12, Rivera reported Depakote and Risperdal controlled his symptoms well, and upon examination his speech was normal. (*Id.* at 301, 302.) By May 5, Rivera had no complaints. (*Id.* at 291.) He was sleeping well, denied poor appetite, and noted no perceptual distortions. (*Id.*) A psychiatric re-evaluation performed on May 16 revealed that Rivera was coping well and reported good compliance with methadone, Depakote, and Risperdal without adverse side effects. (*Id.* at 287.) Physical examinations likewise yielded unremarkable clinical findings, including a non-focal neurological examination. (*Id.* at 285.) Rivera further reported that Tylenol significantly improved his headaches. (*Id.*) Upon discharge, Rivera was referred back to his methadone program at Lafayette Medical Management. (*Id.* at 313; *see id.* at 332, 613.)

   **iv.**   **Beth Israel Medical Center (July – August 2011)**

   Rivera returned to Beth Israel on July 19, 2011, complaining of chronic left hip pain. (*Id.* at 623.) He indicated that he had suffered a left hip injury by a baseball bat fifteen years earlier, but that the pain had recently worsened. (*Id.*) He experienced intermittent pain in his left lower back that radiated to the hip. (*Id.*) The pain became worse with walking and improved with lying flat on his back. (*Id.*) Rivera indicated that he had used Tylenol No. 3 with Elavil for the past five to seven years, prescribed by a Dr. Kahn, who had since moved away. (*Id.*) Rivera also took Klonopin and methadone. (*Id.*) He had been using a cane for the past ten years. (*Id.*) Examination revealed left paraspinal tenderness to palpation without erythema, but with pain

radiating upon extension of the left leg.  (*Id.*)  The diagnosis was back pain secondary to trauma.

(*Id.*)  Ibuprofen was prescribed rather than Tylenol No. 3, given Rivera's history of substance

abuse.  (*Id.*)  Rivera was referred to a pain clinic and advised to apply a heating pad to the

affected area and perform back stretching exercises.  (*Id.*)  Rivera was also referred for x-rays,

which showed mild left hip osteoarthritis.  (*Id.* at 623, 628.)

An August 19, 2011 progress note from Beth Israel revealed that Rivera had not appeared

at a previously scheduled pain management appointment or made an appointment with the

referred orthopedist because he had lost both referrals.  (*Id.* at 643; *see also id.* at 646 (no show

July 25, 2011; rescheduled for August 19, 2011).)  Rivera complained that the ibuprofen was not

working.  (*Id.* at 643.)  The resident physician, Jordan Brodsky, M.D., observed that Rivera was

able to walk without a cane (*id.*), and sat comfortably on a chair, (*id.* at 644).  He continued to

have left paraspinal tenderness; there were no focal, motor, or sensory deficits.  (*Id.*)  The

remaining findings were unremarkable.  (*Id.*)  The diagnoses were back and hip pain, as well as

degenerative joint disease of the left hip.  (*Id.* at 645.)  The doctor prescribed Tylenol and

reissued the referrals for pain management and an orthopedic consult.  (*Id.* at 643, 645.)  Rivera

was to continue methadone, as well Klonopin and Elavil.  (*Id.* at 643.)

### v.　　　Dr. Rodolfo Sandin, M.D., Treating Physician (September 2011)

In a report dated September 15, 2011, Dr. Sandin indicated that he had continued to treat

Rivera for panic disorder.  (*Id.* at 615.)  On mental status examination, Rivera continued to be

"tidy and clean," with coherent speech, a rambling affect, and appropriate (anxious) mood.  (*Id.*)

He denied any vegetative sign of depression.  (*Id.*)  His behavior continued to be "manipulative."

(*Id.*)  While Rivera had "hysteria" features, Dr. Sandin noted that he had no cognitive deficit.

(*Id.*)  Dr. Sandin stated that, in his opinion, Rivera was not able to work.  (*Id.*)

### c.     Medical Evidence On or After Rivera's September 28, 2011 SSI Application

### i.     Beth Israel Medical Center (October – November 2011)

Rivera saw Debra Miller-Saultz, DNP (Doctor of Nursing Practice) at Beth Israel on October 5, 2011.  (*Id.* at 898, 908.)  At the time, Rivera's only reported medication was methadone.  (*Id.* at 898.)  Upon physical examination, Rivera walked with a steady, tandem, and antalgic gait.  (*Id.*)  His posture was "painfully guarded deviation."  (*Id.*) There was decreased range of cervical and lumbar motion and tenderness at the cervical, thoracic, and lumbar levels.  (*Id.*)  Joint motion was preserved.  (*Id.*)  Neurologically, motor strength was preserved, sensory examination showed no focal deficits, muscle tone was normal, and deep tendon reflexes were symmetrical, normoactive, and equal.  (*Id.*)  The assessment was left hip pain.  (*Id.*)

At an October 18, 2011 follow-up visit with Dr. Brodsky at Beth Israel, Rivera reported that his left hip pain was better controlled.  (*Id.* at 639, 641–42.)  He was following with pain management and was compliant with all of his medications (*e.g.*, Klonopin, amitriptyline, methadone, and Tylenol).  (*Id.* at 639.)  Physical examination revealed left paraspinal tenderness to palpation with no erythema; 2+ pulses of the lower extremities bilaterally; normal sensation and strength; intact reflexes; well-flexed, symmetrical movements; normal coordination and range of motion of all joints; and no joint swelling, effusion, or crepitus.  (*Id.* at 639, 641.) Rivera was alert and oriented in all three spheres, with normal affect, good eye contact, and normal speech.  (*Id.* at 641.)  The remainder of the clinical findings were unremarkable.  (*Id.*) Dr. Brodsky assessed osteoarthritis involving more than one site, lumbago, anxiety state (unspecified), and tobacco use disorder.  (*Id.* at 641.)  Dr. Brodsky recommended continuing Tylenol, application of a heating pad, and back stretching exercises for osteoarthritis and lumbago.  (*Id.*)  Rivera was to continue his medications.  (*Id.*)

An October 27, 2011 MRI of the left hip and pelvis revealed minor spurring of the left acetabular rim and a small, non-displaced anterosuperior labral tear. (*Id.* at 626.) The study was otherwise unremarkable. (*Id.*)

At a November 10, 2011 follow-up visit, Rivera complained of continuing hip pain, which increased with his activities. (*Id.* at 896.) DNP Miller-Saultz discussed pain control with methadone. (*Id.* at 896; *see also id.* at 894.)

### ii. John Laurence Miller, Ph.D., Consultative Psychiatric Examiner (December 2011)

John Laurence Miller, PH.D., performed a consultative psychiatric evaluation on December 5, 2011. (*Id.* at 457–61.) Rivera claimed that he had been unable to work since 2001 due to a back injury. (*Id.* at 457.) He had received only outpatient mental health treatment, with no hospitalizations. (*Id.*) Rivera related that he had high blood pressure, emphysema, seizures, a visual impairment, and radiating left hip pain. (*Id.*) His current medications were divalproex sodium (Depakote), amitriptyline (Elavil), clonazepam (Klonopin), ibuprofen, risperidone (Risperdal), gabapentin (Neurontin), Tramadol, and methadone. (*Id.*) He reported that he never slept for long periods, but rather took frequent cat naps. (*Id.* at 458.) He complained of dysphoric moods, diminished self-esteem, hypervigilance, and panic attacks when feeling stressed. (*Id.*) He had no agoraphobia or manic symptoms. (*Id.*) Rivera reported auditory hallucinations in which he heard heavy breathing and a voice. (*Id.*) He also indicated experiencing visual hallucinations in the form of a black shadow walking, and occasionally a ghost from a cemetery that stroked his hand. (*Id.*) Rivera also reported "bizarre" behavior (*e.g.*, breaking down his door when he was unable to unlock it). (*Id.*) He further complained of short-term memory deficit (*e.g.*, forgetting what he went to the store to buy) and time disorientation (*e.g.*, difficulty remembering what day of the week it was, or the month of the year). (*Id.*)

Rivera stated that he had abused alcohol from 1981 to 2001 and marijuana, heroin, and cocaine from 1984 to 2001. (*Id.*) Rivera reported that he had been arrested more than 12 times, beginning in 1994, for possession of a controlled substance and sentenced to five years of probation. (*Id.*) His most recent arrest was in early 2011, again for possession of controlled substances, for which he was sentenced to 90 days in prison. (*Id.* at 458–59.) Dr. Miller made note that 2011 was 10 years after Rivera claimed to have stopped using street drugs. (*Id.* at 459.)

In terms of activities of daily living, Rivera dressed, bathed, and groomed himself, as well as watched television, listened to the radio, and went to the park next door on a daily basis. (*Id.* at 460.) His mother did the cooking, cleaning, laundry, and shopping, as well as managed his money. (*Id.*) He did not take public transportation alone. (*Id.*) He got along well with family members, noting that his one friend was his brother. (*Id.*) His hobbies and interests consisted of listening to compact discs about God, which helped him calm down. (*Id.*)

Upon mental status examination, Dr. Miller observed that Rivera was appropriately dressed and well-groomed. (*Id.* at 459.) Rivera walked with a normal gait and had appropriate eye contact, but his motor behavior was restless. (*Id.*) His speech was fluent and clear, and his expressive and receptive language was adequate. (*Id.*) He had tangential thought processes, a dysphoric affect, and dysthymic mood. (*Id.*) His sensorium was clear, and his orientation to person, place, and time was intact. (*Id.*) Impaired attention and concentration due to a thought disorder or possible malingering was noted. (*Id.*) Rivera's ability to perform simple calculations, including simple money problems, was impaired, and he appeared unable to perform serial-three tasks. (*Id.*) His recent and remote memory were impaired, perhaps also due to malingering (*e.g.*, he was able to recall two-out-of-three objects immediately and after five minutes, and could repeat three digits forward and two digits backwards). (*Id.*) Dr. Miller

further noted that Rivera's intellectual functioning appeared to be average, that his insight and judgment were fair, and that his general fund of information was somewhat limited. (*Id.* at 460.)

Dr. Miller diagnosed the following: panic disorder with agoraphobia; schizophrenia, paranoid type; and personality disorder, not otherwise specified (NOS), with borderline features. (*Id.*) In a medical source statement, Dr. Miller opined that Rivera could do the following: follow and understand simple directions and instructions; perform simple, but not complex, tasks independently; and relate adequately with others. (*Id.*) Rivera's alleged difficulties maintaining attention, concentration, and a regular schedule; making appropriate decisions; dealing appropriately with stress; and learning new tasks appeared to be caused by "lack of motivation and psychiatric problems." (*Id.*) Dr. Miller opined that Rivera's limitations might significantly interfere with his ability to function on a daily basis. (*Id.*)

### iii.      Beth Israel Medical Center (December 2011)

Rivera next saw DNP Miller-Saultz on December 7, 2011, and reported adequate pain control with current medications and improved function with pain relief. (*Id.* at 894, 895.) He continued with his methadone program, (*id.* at 895), and denied any side effects of medication, (*id.* at 894).

### iv.      Dr. Rodolfo Sandin, M.D., Treating Physician (December 2011)

Dr. Sandin issue a report on December 13, 2011, in connection with Rivera's SSI claim. (*Id.* at 427–28.) Dr. Sandin stated that he saw Rivera on a monthly basis most recently on December 2. (*Id.*) Rivera was friendly and cooperative and no longer took Xanax. (*Id.* at 427.) Dr. Sandin observed on that date that Rivera was "tidy and clean." (*Id.* at 428.) He had no motivation or self-esteem, and felt that he was "inadequate." (*Id.*) His current medications were Klonopin, Risperdal, Depakote, as well as Elavil at bedtime for sleep. (*Id.*)

### v. Beth Israel Medical Center (December 2011 – January 2012)

Rivera was evaluated by Beth Israel's Kenji Miyasaka, M.D. – an orthopedist – on December 20 2011, for left hip pain.  (*Id.* at 668–69; *see also id.* at 34 (Rivera testifying that Dr. Miyasaka was his orthopedist).)  Rivera reported feeling better, although he indicated he had to sit leaning away from his left to alleviate back pain.  (*Id.* at 668.)  He currently took Tylenol, Gabaperitin, and Tramadol for pain.  (*Id.*)  On examination, Dr. Miyasaka observed that Rivera walked with a cane and leaned to the right when seated.  (*Id.*)  Rivera's range of hip motion was preserved.  (*Id.*)  He had tenderness and pain to the left hip joint; his sensation was intact.  (*Id.*)  Dr. Miyasaka assessed joint pain in the pelvis region and thigh, and recommended physical therapy.  (*Id.*)

On January 4, 2012, Rivera again reported to DNP Miller-Saultz that the medication provided adequate pain relief.  (*Id.* at 894.)  She noted that Rivera continued to assist his mother.  (*Id.*)

### vi. Dr. Jerome Caiati, M.D., Consultative Internal Examiner (January 2012)

Jerome Caiati, M.D., performed a consultative internal examination on January 12, 2012.  (*Id.* at 602–05.)  Rivera complained of a history of hypertension, bipolar disorder, polysubstance abuse, decreased vision, low back disorder, and left hip degenerative disease.  (*Id.* at 602.)  He had a history of smoking a pack of cigarettes per day since 1987.  (*Id.*)  He stated that he used to drink alcohol, starting in 1985, but stopped.  (*Id.*)  He also claimed to have begun using marijuana in 1984 and heroin in 1990, but had stopped using both drugs.  (*Id.*)  Rivera lived with his mother, and claimed he was unable to cook, clean, do laundry, or go shopping because of his hip pain.  (*Id.*)  He could shower, bathe, and dress himself.  (*Id.*)  He watched television and went to the park.  (*Id.*)  His hobby was painting.  (*Id.*)

Upon examination, Rivera's blood pressure was 142/88. (*Id.* at 603.) Dr. Caiati observed that Rivera's corrected vision was 20/40 and 20/30 in the right and left eyes, respectively, and 20/40 with both eyes. (*Id.*) He appeared obese and in no acute distress. (*Id.*) Rivera used a cane that he said was prescribed by a doctor. (*Id.*) His gait demonstrated a minimal limp to the left with and without the cane, and his stance was normal. (*Id.*) He could walk on his heels and toes with minimal difficulty, and squat half-way holding on to support, complaining of left hip pain. (*Id.*) Rivera needed no help getting on and off the examining table, and he could arise from a chair with difficulty, complaining of left hip pain. (*Id.*) His cervical spine had full range of motion. (*Id.* at 604.) Lumbar spine, left hip, and left knee motion, as well as straight leg raising, were reduced due to left hip pain. (*Id.*) Joints were stable and non-tender, and there was no redness, heat, swelling, or effusion. (*Id.*) Deep tendon reflexes were physiological and equal in the upper and lower extremities, and no sensory deficit was noted. (*Id.*). Strength was full (5/5) in all extremities. (*Id.*)

Dr. Caiati diagnosed obesity and history of bipolar disorder, polysubstance abuse, decreased vision, low back pain, left hip degenerative joint disease, and symptomatic high blood pressure (which was slightly elevated.) (*Id.* at 604–05.) He opined that Rivera's ability to sit, reach, push, and pull was unrestricted. (*Id.* at 605.) Standing, walking, climbing, bending, and lifting were minimally-to-mildly limited due to left hip pain. (*Id.*)

### vii. Dr. R. McClintock, M.D., State Agency Psychiatric Consultant (January 2012)

On January 23, 2012, R. McClintock, M.D., a State agency psychiatric consultant, reviewed the medical evidence of record and completed a psychiatric review technique form. (*Id.* at 438–52.) Dr. McClintock opined that Rivera's mental disorders did not meet the criteria of Sections 12.03 (Schizophrenic Paranoid and other Psychotic Disorders), 12.06 (Anxiety-

Related Disorders), 12.08 (Personality Disorders), and 12.09 (Substance Abuse Disorders) of the Listing of Impairments. (*Id.* at 438, 440, 443, 445–46.) With respect to the "B" criteria of the Listings, Dr. McClintock assessed that Rivera had the following: mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate restrictions in maintaining concentration, persistence, or pace; and no episodes of deteriorations. (*Id.* at 448–49.)

Dr. McClintock also assessed Rivera's mental residual functional capacity and opined that he was capable of carrying out the functions necessary for performing basic work activities. (*Id.* at 453–55.) In reaching this conclusion, Dr. McClintock relied on the totality of the evidence, including: records from a long-standing treating source since 1996, Dr. Sandin; participation in Lafayette Medical Management's methadone program; records from Rikers Island Correctional Facility; and, the findings and conclusions of Dr. Miller, the consultative psychologist. (*Id.* at 455.)

> ### viii.    Beth Israel Medical Center (February – October 2012)

At a February 1, 2012 visit, Rivera reported to DNP Miller-Saultz that his left hip pain was exacerbated by walking, standing, bending, and inclement weather. (*Id.* at 891.) The pain improved with heat and rest, and his current medications adequately relieved pain without any side effects. (*Id.*) On March 1, Rivera reported pain exacerbation with inclement weather and noted that his left buttocks were "sticking" with sitting. (*Id.* at 893, 930.) He continued to deny side effects from medication. (*Id.* at 893.) At a March 30 follow-up visit, Rivera reported adequate pain control with the addition of Neurontin. (*Id.* at 894.) He reported drowsiness when taking Neurontin at night and DNP Miller-Saultz recommended that he take the medication closer to bedtime. (*Id.*) Rivera reported no other side effects. (*Id.*)

On April 25, 2012, Rivera relayed to DNP Miller-Saultz that his pain continued to be adequately controlled with his current medications and he had improved function. (*Id.*) He stopped taking Neurontin unilaterally without effect, but was having difficulty sleeping. (*Id.*) On examination, DNP Miller-Saultz observed a tandem, steady, and antalgic gait and station, with Rivera using a cane for support. (*Id.* at 906.) His posture had a painfully guarded deviation. (*Id.*) His motor strength was preserved with no focal sensory deficits and normal muscle tone. (*Id.*) He was alert and oriented in all three spheres, with an anxious mood, intact long and short-term memory, and a cognition that appeared intact with appropriate insight and judgment. (*Id.*) The remaining clinical findings were unremarkable. (*Id.*) The assessment was left hip pain, and the plan was to continue methadone and discontinue Neurontin. (*Id.*)

At a May 24, 2012 visit, in addition to reporting adequate pain control with no side effects, Rivera relayed to DNP Miller-Saultz that he continued to support and care for his mother and brother. (*Id.* at 903.) Examination findings remained unchanged. (*Id.* at 907.) On June 21, DNP Miller-Saultz again observed Rivera using a cane to walk. (*Id.* at 940.) He had restarted Neurontin, which had decreased a burning pain in his left leg that was worse at night, and had improved his sleep. (*Id.*) Rivera again denied any side effects from medication. (*Id.*) He also reported increased neck pain and withdrawal symptoms of diaphoresis and diarrhea with a decrease in methadone from forty to thirty milligrams daily. (*Id.*) They discussed a titration of methadone for improved pain and symptom-control, and Rivera indicated that he would like to try a slower taper in the colder weather. (*Id.*)

Ricardo Cruciani, M.D., in conjunction with Shatabdi Patel, M.D., of Beth Israel examined Rivera on July 31, 2012. (*Id.* at 897, 899, 904, 913.) Rivera reported that Neurontin was working well, although his pain was currently at an eight-to-nine out of ten, because he had

run out of medication. (*Id.* at 902.) His pain was a two out of ten when on methadone. (*Id.*) Rivera's gait and station was tandem, steady, and antalgic; he used a cane for support; and his posture had a painfully guarded deviation. (*Id.* at 899.) The doctors' assessment was left sacroiliac joint chronic pain syndrome, and they recommended the following: continuing methadone, weaning Rivera down by ten milligrams per day once the weather was colder; increasing the dosage of Neurontin when weaning down the methadone; and considering a left sacroiliac joint injection. (*Id.* at 897.)

When Dr. Cruciani re-examined Rivera on September 26, 2012, Rivera reported that his pain was a lot better with the additional doses of Neurontin and methadone. (*Id.* at 902.) There was no aberrant drug-related behavior and no medication side effects. (*Id.*) The assessment remained left sacroiliac joint chronic pain syndrome, and Dr. Cruciani recommended continuing methadone and Neurontin, and referred Rivera for an intervention pain injection consultation. (*Id.* at 901; *see id.* at 910.) On October 15, Rivera underwent a left hip Lidocaine injection with fluoroscopy. (*Id.* at 795.) The procedure was performed without complication, and Rivera reported a good improvement in pain afterwards. (*Id.*)

### ix. Dr. Rodolfo Sandin, M.D., Treating Physician (November 2012)

Dr. Sandin issued a one-page report on November 14, 2012, diagnosing Rivera with "factitious disorder."[2] (*Id.* at 888.) Regarding Rivera's mental status, Dr. Sandin observed that he was a "fairly kempt," "good-looking" person who had gained a considerable amount of weight. (*Id.*) Dr. Sandin referred to Rivera's prior odd jobs, such as an assistant in a laundromat, stating that he was unable to handle a job due to irritability. (*Id.*) Dr. Sandin wrote that Rivera deteriorated under minimal stress and had low self-esteem issues. (*Id.*) Dr. Sandin

---

[2] Factitious disorders are conditions in which a person deliberately and consciously acts as if he or she has a physical or mental illness when he or she is not really sick. *WebMD* Mental Health Center: Factitious Disorders, http://www.webmd.com/mental-health/factitious-disorders (last visited Dec. 28, 2016).

further noted Rivera's history of heroin use since age 15 and current maintenance on methadone. (*Id.*) Rivera required no detoxification or hospitalization, and he allegedly cared for a younger person (unnamed). (*Id.*) Dr. Sandin opined that Rivera was unable to work. (*Id.*)

### d. Vocational Expert Evidence

Yakoff Tites testified as a vocational expert ("VE") at Rivera's hearing. (*Id.* at 71–74.) The ALJ asked the VE a hypothetical as to whether work existed for an individual with the same vocational profile as Rivera, who could do the following: lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk a total of two hours; sit for a total of six hours; occasionally climb, balance, stoop, kneel, crouch, and crawl; understand, remember, and carry out only simple or routine instructions; and was limited to low stress work, meaning work requiring only occasional decision-making and judgment, occasional changes in the work setting, procedures, and tools, and occasional interaction with coworkers and the general public. (*Id.* at 71–72.) Although the individual could not perform Rivera's past relevant work, the VE identified sedentary, unskilled jobs that the individual could perform, such as: (1) an addresser, (DOT[3] Code No. 209.587-010), with 96,000 and 2,000 jobs in the national and local economies, respectively; (2) a document preparer (DOT Code No. 249.587-018), with 2.8 million and 2,600 jobs in the national and local economies, respectively; and (3) a sack repairer (DOT Code No. 782.268-046), with 142,000 and 2,400 jobs in the national and local economies, respectively. (*Id.* at 72.) The VE further attested that a need to use a cane for balance while walking would not affect the identified jobs. (*Id.* at 73.) The VE also testified that in addition to the three customary morning, lunch, and afternoon breaks, it would be acceptable for the individual to take up to four, five-minute unscheduled breaks to, for example, take medication. (*Id.* at 73–74.)

---

[3] The "DOT" numbers refer to the corresponding occupation code in the U.S. Department of Labor, *Dictionary of Occupational Titles* (4th ed., rev'd 1991), *available at* www.oalj.dol.gov/libdot.htm.

## STANDARD OF REVIEW

**I. Review of Denial of Social Security Benefits**

The Court does not make an independent determination about whether a claimant is disabled when reviewing the final determination of the Commissioner. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." (*Id.*) (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case . . . [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.     Eligibility Standard for Supplemental Security Income

To qualify for SSI benefits, an individual must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). This requires a five-step analysis for determining whether a claimant is disabled:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.
>
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.
>
> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.
>
> [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. § 416.920(a)(4). The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

## DISCUSSION

In support of his motion for judgment on the pleadings, Rivera argues that the ALJ's determination was not based on substantial evidence and that the ALJ violated the "treating

physician rule" by disregarding the findings of Rivera's treating physician, Dr. Sandin.  (*See*

Pl.'s Mem. at 8–10.)

## I.    The ALJ Properly Followed the Five-Step Analysis

The ALJ carefully considered the totality of the evidence.  At step one, the ALJ found

that Rivera had not engaged in substantial gainful activity since the application date, September

28, 2011.  (Admin. R. at 12.)  At step two, the ALJ concluded that Rivera's mild left hip

osteoarthritis and left hip chronic pain syndrome were his only severe impairments.  (*Id.*)  At step

three, the ALJ determined that Rivera did not have an impairment or combination of

impairments that met or equaled the severity of one of the impairments in the Listings.  (*Id.* at

14.)  Considering the totality of the medical evidence, as well as Rivera's statements regarding

his subjective complaints, the ALJ concluded that Rivera retained the residual functional

capacity ("RFC") to perform light work, as defined in 20 C.F.R. § 416.967(b).[4]  Specifically, the

ALJ found that Rivera:

> 1. could not lift and carry more than twenty pounds occasionally and ten pounds
> frequently;
> 2. could sit up to six hours in an eight-hour work day;
> 3. could stand and walk for a combined total of up to two hours, in an eight-hour day;
> 4. could only occasionally climb, balance, stoop, kneel, crouch, and crawl;
> 5. needed to use a cane for balance when walking, but was able to carry small objects
> while walking;
> 6. could understand, remember, and carry out simple or routine instructions; and
> 7. could undertake only low stress work, meaning only occasional decision-making and
> judgment, occasional changes in the work setting, procedures, and tools, and occasional
> interaction with coworkers and the general public.[5]

---

[4]  Light work involves lifting no more than twenty pounds at a time, with frequent lifting or carrying of objects
weighing up to ten pounds.  20 C.F.R. § 416.967(b); *See* Social Security Rulings ("SSR") 83-10.  Even though the
weight lifted may be very little, a job is in this category may require a good deal of walking or standing, or, when it
involves sitting most of the time, it may involve some pushing and pulling of arm-hand or leg-foot controls.  (*Id.*)

[5] Despite the ALJ's determination that Rivera could perform light work, the VE ultimately provided potential job
options for Rivera that constituted sedentary work – a category of work that is even more limited than light work.
(*See* Admin. R. at 72.)  Sedentary work involves "lifting not more than 10 pounds at a time and occasionally lifting
or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. 416.967(a).  Walking and standing are
required only occasionally.  *Id.*

(*Id.* at 14.)  At step four, the ALJ found that Rivera could not perform his past relevant work.

(*Id.* at 16.)  At step five, the ALJ considered Rivera's RFC and vocational factors and concluded that he could perform work that exists in significant numbers in the national and local economies, and, thus, found him not disabled.  (*Id.* at 16–17.)

## II.  Substantial Evidence Supports the ALJ's RFC

The RFC is the most an individual can do despite his limitations.  20 C.F.R. § 416.945(a)(1); SSR 96-8p.  It is assessed based on all the relevant medical and other evidence of record, and takes into consideration the limiting effects of all of a claimant's impairments.  20 C.F.R. § 416.945(a)(2)–(3).  The ALJ is responsible for deciding a claimant's RFC and, in making that determination, the ALJ must consider all relevant medical and other evidence, including any statements about what the claimant can still do provided by any medical sources. *See* 20 C.F.R. §§ 416.927(d), 416.945(a)(3), 416.946(c).  Rivera had the burden of presenting evidence that he was incapable of performing substantial gainful activity.  42 U.S.C. § 23(d)(5)(A) (applicable to SSI through 42 U.S.C. § 1382c(a)(3)(H)(i)); 20 C.F.R. §§ 416.912(c), 416.945(a)(3); 68 Fed. Reg. 51153, 51155 (August 26, 2003); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his medical condition, to do so.").  Accordingly, Rivera was required to demonstrate the existence of a severe impairment or impairments that result in an RFC that prevented him from performing substantial gainful activity.  *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).  Furthermore, it is for the ALJ to resolve genuine conflicts in the evidence.  *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Schaal*, 134 F.3d at 504 ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record.").  Here, the record reflects that the ALJ properly exercised her discretion in resolving the evidentiary

conflicts in the record and assessed an RFC that is supported by substantial evidence. *See Veino*, 312 F.3d at 588.

Based on the entire record, the ALJ reasonably concluded that Rivera retained the RFC to perform a range of light work, and substantial evidence supports this RFC finding. Regarding Rivera's left hip pain, the ALJ looked to the October 2011 MRI findings showing only mild spurring and a small labral tear. (Admin R. at 15, 626, 640.) The ALJ also looked to the clinical findings of treating and non-treating physicians reflecting largely normal or unremarkable findings throughout the record, (*id.* at 15), including normal or near normal ranges of motion, (*id.* at 604, 640–41), intact neurological findings, (*id.* at 285, 337, 604, 621, 639, 644, 666, 906, 907), and even an ability to ambulate without a cane, (*id.* at 643). Such evidence is not demonstrative of an incapacitating hip condition exceeding the demands of the RFC determined by the ALJ.

The ALJ also relied largely on the findings and conclusions of consultant Dr. Caiati in reaching the RFC determination. (*Id.* at 15.) Dr. Caiati opined that Rivera was unrestricted in sitting, reaching, pushing, and pulling; and, due to hip pain, Rivera was only minimally-to-mildly restricted with regard to standing, walking, climbing, bending, and lifting. (*Id.* at 605.) The ALJ noted that there were "very few objective signs of impairment," in conjunction with the very few objective findings of limitations by treatment records discussed. (*Id.* at 15.) *See* 20 C.F.R. § 416.927(c)(3), (4) (stating that more weight is given to an opinion that is supported by, and not inconsistent with, substantial evidence of record). Dr. Caitati's assessments, and the record as a whole, support the ALJ's findings that Rivera could sit for six hours, could stand and/or walk for two hours, could lift and carry no more than twenty pounds occasionally and ten pounds frequently, could occasionally perform postural activities, and needed a cane for balance. (*See* Admin. R. at 14.)

Likewise, the largely unremarkable mental status findings in the record, particularly the absence of evidence of a cognitive impairment, failed to establish a severe mental impairment that significantly limited Rivera's ability to perform work-related tasks. (*See id.* at 13, 15; *see also id.* at 287, 293, 301–302, 314, 318, 333, 459–60, 615, 641, 906.) Indeed, in light of his mental status examination observations, Dr. Miller, who conducted a consultative psychiatric evaluation in December 2011, found that Rivera could follow and understand simple directions and instructions, perform simple tasks independently, and relate adequately with others. (*Id.* at 460; *see also id.* at 15.) This is commensurate with the ALJ's RFC determination for unskilled, low stress work, with minimal interaction with co-workers or the general public. (*Id.* at 14.)

## III.    The ALJ Properly Applied The Treating Physician Rule

The regulations governing the ALJ's deliberations state that

[g]enerally, [the ALJ] give[s] more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). Here, the ALJ rejected the November 2012 statement by Rivera's treating psychiatrist Dr. Sandin that Rivera could not work. (Admin. R. at 15, 888.) A treating source's opinion on the issues of the nature and severity of a claimant's impairments is generally entitled to controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence of record. 20 C.F.R. § 416.927(c)(2).[6] When an opinion is unsupported, or when it is inconsistent

---

[6] When a treating source's opinion is not afforded controlling weight, the following factors are, *inter alia*, considered in determining what weight to afford the opinion: the length, nature, and extent of the treatment relationship; the relevant evidence supporting the opinion; and the consistency of the opinion with the record as a whole. 20 C.F.R. 416.927(c)(2)–(6).

with other substantial evidence, the ALJ is not required to afford deference to that opinion and may use his discretion in weighing the medical evidence as a whole. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

As an initial matter, the ALJ noted that Dr. Sandin's statement that Rivera could not work was on an issue reserved to the Commissioner, and, therefore, the statement was neither binding nor entitled to special significance. (Admin. R. at 15.) *See* 20 C.F.R. § 416.927(d)(1); *see also* SSR 96-5p; *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[S]ome kinds of findings— including the ultimate finding of whether a claimant is disabled and cannot work—are reserved to the Commissioner . . . . A treating physician's statement that the claimant is disabled cannot itself be determinative." (internal quotation marks omitted)). Moreover, the ALJ noted that Dr. Sandin's treatment notes did not document decompensation or other findings of severe limitations that would preclude Rivera from performing the mental tasks contained in the RFC determination. (Admin. R. at 15.) The only bases Dr. Sandin noted in the November 2012 report regarding Rivera's inability to handle a job were irritability, low self-esteem, and his self-report that he deteriorated under minimal stress. (*Id.* at 888.) The only historical support for Dr. Sandin's determination that Rivera could not work is found in a medical source statement that is undated, but appears to be from before September 2006, which notes that Rivera has marked restrictions with respect to his ability to interact appropriately with supervisors and co-workers, respond appropriately to work pressures and changes in a routine work setting, and understand, remember, and carry-out detailed instructions. (*Id.* at 870–71.) Though the ALJ did not find Rivera's mental impairments to be severe, these limitations were largely accounted for in the hypothetical the ALJ presented to the VE, which noted the individual could understand, remember, and carry out only "simple or routine instructions" and could undertake "low stress

work, meaning only occasional decision-making and judgment, occasional changes in the work setting, procedures, and tools, and occasional interaction with coworkers and the general public."[7]  (*Id.* at 14.)

Moreover, Dr. Sandin's opinion that Rivera could not work is unsupported by his own treatment notes.  In his November 2012 report, Dr. Sandin noted that Rivera cared for a younger person.  (*Id.* at 888.)  Dr. Sandin also diagnosed Rivera with "facticious disorder."  (*Id.*)  Further, in all other reports of record, Dr. Sandin found Rivera cooperative and "tidy and clean," with coherent speech, appropriate affect, and fair knowledge, judgment, and insight.  (Admin. R. at 427–28, 614, 615, 838, 853–54.)  Given that Dr. Sandin's own clinical findings and observations undermine his conclusion that Rivera could not work, and that substantial other evidence in the record supported the ALJ's findings, the ALJ did not err in finding that Rivera's mental impairments were not severe at step two.  *See Schaal*, 134 F.3d at 504 ("It is for the SSA . . . to weigh the conflicting evidence in the record.")  For the foregoing reasons, the ALJ correctly applied the treating physician rule and properly found that Rivera's mental impairments were not severe.

## IV.    The ALJ's Credibility Finding is Based on Substantial Evidence

A credibility finding by an ALJ is entitled to deference by a reviewing court "because [the ALJ] heard plaintiff's testimony and observed [plaintiff's] demeanor."  *Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995).  The ALJ must analyze the credibility of a claimant as to her symptoms through a two-step test.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d

---

[7] Rivera also argues that the ALJ neglected to consider Dr. Miller's findings regarding his mental health.  Dr. Miller found that his examination results were "consistent with psychiatric problems and this may significantly interfere with the claimant's ability to function on a daily basis."  (Admin. R. at 460.)  Specifically, Dr. Miller found that Rivera would "have difficulty performing a complex task independently," but that he could "understand simple directions and instructions, perform simple tasks independently and relate adequately with others."  (*Id.*)  Dr. Miller further found that Rivera's difficulties "appear to be caused by lack of motivation and psychiatric problems."  (*Id.*)  As with Dr. Sandin's findings, these limitations were adopted into the ALJ's hypothetical discussed above.  (*Id.* at 14.)

Cir. 2010). The ALJ must first decide "whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). Next, if the ALJ determines that the claimant does have such an impairment, he must consider "'the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (quoting 20 C.F.R. § 404.1529(a) (alternations omitted)). When evaluating the "intensity, persistence and limiting effects of symptoms, the Commissioner's regulations require consideration of seven specific, *objective* factors . . . that naturally support or impugn *subjective* testimony of disabling pain and other symptoms." *Dillingham v. Colvin*, No. 14-CV-105 (ESH), 2015 WL 1013812, at *5 (N.D.N.Y. Mar. 6, 2015). These seven objective factors are:

> (i) [the] claimant's daily activities; (ii) [the] location, duration[,] frequency, and intensity of [the] claimant's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) [the] type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate [the claimant's] pain or other symptoms; (v) treatment, other than medication, [the] claimant receives or has received for relief of her pain or other symptoms; (vi) measures [the] claimant uses or has used to relieve pain or other symptoms; and (vii) other factors concerning [the] claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *5 n.22 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)). "While it is 'not sufficient for the ALJ to make a single, conclusory statement that' the claimant is not credible or simply recite the relevant factors, remand is not required where 'the evidence of record permits [the Court] to glean the rationale of the ALJ's [credibility] decision.'" *Cichocki v. Astrue*, 534 F. App'x 71, 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). In such a case, "the ALJ's failure to discuss those factors not relevant to [her] credibility determination does not require remand." *Id.*

Here, the ALJ followed the two-step process in considering Rivera's symptoms. (Admin. R. at 14.) First, the ALJ determined that Rivera did have medically determinable impairments that could reasonably be expected to cause the alleged symptoms. (*Id.* at 15.) However, at step two, the ALJ found that Rivera's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. (*Id.*) The ALJ was skeptical of several of Rivera's statements at the hearing, including his claim that he did not know what an oath was, did not know his age, could not make a sandwich, and could not bathe himself. (*Id.* at 15–16.) The ALJ noted that "[t]hese extreme limitation[s] in his activities of daily living [were] not otherwise mentioned or supported in the record and are not consistent with [Rivera's] medical history, medication usage, or reports to his treating providers. (*Id.* at 16.) The ALJ further noted that Rivera claimed to experience constant pain, but, on numerous occasions, Rivera reported that his pain was adequately controlled with medications. (*Id.* at 15.)

Additionally, Dr. Miller had posited that Rivera's reported problems with attention, concentration, and memory might be the product of malingering. (*Id.* at 459.) In 2012, Rivera's treating physician Dr. Sandin suggested that he might suffer from factitious disorder, (*id.* at 888), and similarly described Rivera as "manipulative" in multiple earlier reports (*see, e.g.*, *id.* at 614 (2007), 615 (2011)). Given the skepticism that the ALJ, Dr. Miller, and Dr. Sandin all expressed regarding the sincerity of Rivera's reported symptoms, there is ample evidence in the record to support the ALJ's credibility determination.

## V.    Substantial Evidence Supports The ALJ's Finding That Rivera Was Capable of Performing A Significant Number of Jobs in The National Economy

After determining Rivera's RFC, the ALJ proceeded to step four of the sequential analysis and found that Rivera could not perform his past relevant work. (*Id.* at 16.) At step five, the ALJ considered Rivera's RFC, together with his age, limited education, and work

experience, to determine whether he could perform other work that existed in significant numbers in the national economy. (*Id.* at 16–17.) *See also* 20 C.F.R. §§ 416.920(f), 416.963–65, 416.967. Because the ALJ found that Rivera's RFC for the full range of light work was compromised by additional exertional and non-exertional limitations, he obtained VE testimony about whether work existed in the national economy for a hypothetical person with the same age, education, work experience, and RFC as Rivera. (Admin. R. at 17, 71–72.) The VE responded that such a hypothetical person would be able to perform work existing in significant numbers in the national economy, including work as an addresser, document preparer, and sack repairer. (*Id.* at 72–74.)

An ALJ may rely on a vocational expert to determine whether there is work that exists in significant numbers in the national economy that a claimant could perform given his vocational factors and RFC. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983). In light of Rivera's vocational profile and well-supported RFC, and considering the VE testimony, there is sufficient support for the ALJ's finding that Rivera is capable of performing jobs that exist in significant numbers in the national economy. (Admin. R. at 16–17); 20 C.F.R. Part 404, Subpart P, Appendix 2; Section 200.00(e)(2); SSR 83-12, 83-14, 85-15.

## CONCLUSION

For the reasons stated herein, the Commissioner's motion for judgment on the pleadings (Doc. No. 17) is granted and Rivera's cross-motion (Doc. No. 15) is denied. The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: Brooklyn, New York
      January 4, 2017

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge